### Illinois Central Railroad Co. v. William Clark.

1. NEGLIGENCE—*May be Proved by Circumstantial Evidence.*—Negligence, like any other fact, may be proved by circumstantial evidence.

2. ORDINARY CARE—*A Question for the Jury.*—The question as to whether the plaintiff at the time of the injury was in the exercise of ordinary care, is one of fact for the determination of the jury.

3. SAME—*In Approaching Private Crossings.*—Where a railroad company constructs a walk across its right of way, at a street crossing, from the end of the sidewalk of the street to the end of the sidewalk on the other side, so as to form a connection of the walks, and tacitly consents to the use of such walk by the public, it practically extends the walks of the street across its right of way, and under such circumstances it is incumbent upon it to exercise substantially the same care for the safety of the public as the law requires of it when its train is approaching a public crossing, except perhaps in the matter of ringing a bell or sounding a whistle.

**Action in Case,** for personal injuries.  Trial in the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge, presiding.  Verdict and judgment for plaintiff; appeal by defendant.  Heard in this court at the October term, 1898.  Affirmed.  Opinion filed July 20, 1899.

· JOHN G. DRENNAN, attorney for appellant; JAMES FENTRESS, of counsel.·

Where a pedestrian, even at a regular railroad crossing, is injured by a car door being open, cinder, coal or stick falling, etc., of the original construction or loading of which there is no complaint, the plaintiff must aver and prove negligence.  Negligence will not be presumed from the mere happening of the accident.  Case v. C., R. I. & P. Ry. Co., 19 Am. & Eng. Ry. Cases, 142, and citations; Wiedmer v. Ry. Co., 114 N. Y. 462; L. & N. Ry. Co. v. Wade, 36 S. W. Rep. 1125; De Vau v. P. & N. Y. C. R. R. Co., 130 N. Y. 632; C. & N. W. Ry. Co. v. Moranda, 93 Ill. 303; Same v. Same, 108 Ill. 583; 2 Thompson on Negligence, 1227.

· "Although a railroad company has, by permitting people repeatedly to cross its tracks at a point where there is no public right of passage, given an implied license to do so, it owes no duty of active vigilance to those crossing to guard them from accident.  The licensees acting under it take the risks incident to the business."  Sutton, Adm'r, v. N. Y. C. & H. R. R. Co., 66 N. Y. 243; Larmore v. C. P. I. Co., 101 N. Y. 391; Nicholson, Adm'x, v. Erie Ry. Co., 41 N. Y. 525.·

To constitute a highway, it must be one over which all the people of the State have a common and equal right to travel, and in which they have a common, or at least a general interest to keep unobstructed.  Wood on Railroads, Vol. 1, 2d Ed., 790.

In order to cast upon the railway a duty toward persons crossing its tracks, the person so using the track must be at a place where the public have an actual right as against the railway company to cross, and not at a place where the crossing is at the sufferance and mere grace of the railway company.  McCreary v. B. & M. Ry. Co., 153 Mass. 300.

JAMES C. MCSHANE, attorney for appellee.

Where the public are permitted to pass over the depot grounds in going from one part of a city to another, such grounds are made *quasi* public by the general use to which they are appropriated, and a person does not become a trespasser by passing over them in a proper manner. I. C. R. R. Co. v. Hammer, 72 Ill. 347; L. E. & W. Ry. Co. v. Zoffinger, 10 Ill. App. 258. See also C. C. R. R. Co. v. Frelka, 110 Ill. 498, and T. W. & W. Ry. Co. v. Main, 67 Ill. 298; Skjeggarud v. M. & St. L. R. R. Co. (Minn.), N. W. Rep. 572.

When a railroad company has for years, without objection, permitted the public to cross its tracks at a certain point, not in itself a public highway, those using the crossing are not trespassers, and the company owes the duty of reasonable care toward them. Taylor v. D., etc., Canal Co. 113 Pa. St. 162.

In a note to Turner v. Fitchburg R. Co., 35 Am. & Eng. R. Cases, 320, it is said ·

"Where a railroad company knowingly permits a place in a highway crossing to be used as a crossing by the general public for years, the public thereby acquire an easement in such crossing, and the company is bound to use reasonable care at such crossing and give the statutory notice and warning of the approach of trains (Byrne v. N. Y. C. & H. R. R. C., 104 N. Y. 362; 58 Am. Rep. 512; Barry v. N. Y. C. & H. R. R. Co., 92 N. Y. 289; 13 Am. & Eng. R. Cas. 615); and exercise care similar to that required at a legally-established public highway crossing." Harriman v. P., C. & St. L. R. Co., 45 Ohio St. 11; 32 Am. & Eng. R. Cas. 37; Kelly v. S. M. R. Co., 28 Minn. 98; 6 Am. & Eng. R. Cas. 264; Taylor v. D. & H. C. Co., 113 Pa. St. 162; 28 Am. & Eng. R. Cas. 656; 57 Am. Rep. 446.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment rendered in favor of appellee and against appellant for $4,000, in an action for alleged negligence, by reason of which appellee was injured. Appellant has eight railway tracks running north and south in the city of Chicago, and crossing what would be part of Seventy-second street, an east and west street if that street

were produced across the right of way.   The tracks are numbered 1 to 8, number 1 being the extreme western and number 8 the extreme eastern track.   Prior to the fall of 1893 the appellant's right of way was inclosed by wire fences about seven feet high on the east and west sides.   In the fall of 1893 appellant erected a depot or passenger station on the west side of its right of way, and about 105 or 106 feet north of what would be the north line of Seventy-second street, if produced across the right of way, and an elevated platform in front of the depot between tracks 1 and 2.   At the same time appellant constructed a walk of the width of about six feet across its tracks on what would be the north six feet of Seventy-second street if produced as above stated.   This walk commenced at the western end of the sidewalk on the north side of Seventy-second street, east of the right of way, and at its western end connected with the north sidewalk space of Seventy-second street.   A walk or ground platform ran from the elevated platform to this cross-walk.   The surface of the cross-walk was on a level with the surface of the rails.   On the north side of Seventy-second street, west of the railroad right of way, there was no sidewalk at the time of the accident for a distance of about 100 feet.   When the walk was constructed across the tracks, openings were made in the wire fences at the ends of the walk, and gates were hung in the openings.   A witness for appellant testified that at the time of the trial these gates were open and nailed back, and the evidence shows that at the time of the accident, and prior thereto, there was nothing to obstruct passage through the openings to the walk from Seventy-second street east or west of the right of way.   The evidence shows that from the fall of 1893 this walk across the right of way was used generally by all persons desiring to cross that way.   It was admitted on the trial by appellant's counsel that prior to the accident people had been in the habit of crossing the right of way on the walk without restriction by appellant. A witness for appellant testified that there are wooden sign boards on posts near the gates at the openings to the cross-

walk, which can be seen from the east or west side as you approach the station, on which signs were the following words: "Notice. Station Grounds. For use only by this company and its patrons; not a public thoroughfare. Illinois Central Railroad Company;" that he was not sure whether the notice was on both sides of the boards or not. South of the cross walk was a signal structure, and it was the custom for south-bound trains, except through passenger trains, to stop north of the cross-walk until they got a signal to proceed. Ryan, conductor of the train which is alleged to have caused the injury, testified:

"They generally always made it a practice to stop north of that crossing, not to block it, because, generally, we met a dummy pretty near every night; we used to come in there about that time, and we generally made a practice to stop north of the crossing and let the people go by."

A short distance south of the crossing there were switches. A transfer train of appellant, consisting of eleven box cars and a caboose, left South Chicago about 5:30 o'clock, P. M., April 8, 1895, on the South Chicago branch of appellant's road, proceeded north past Sixty-seventh street, got on main track number 5 above mentioned, and backed south on that track to Seventy-second street, the caboose being in front and the engine in the rear. The train was proceeding south to Fordham yards, which is about Eighty-third street. The object of the trip was to transfer the cars from South Chicago to Fordham yards. Cheltenham, the Baltimore and Ohio junction, South Chicago and Fordham yards are south of Seventy-second street, in the order mentioned. There were some refrigerator cars in the train and three fruit cars, but where in the train the refrigerator and fruit cars were does not appear. The doors of the refrigerator cars are two feet in width by eight feet in height, and are a means of ingress and egress. The fruit cars have small doors, which are merely for the purpose of ventilation; they are made of pine, weigh about four pounds, are fifteen and three-fourths inches square, and are on the sides of the car, one near each end, the lower end of each door being four feet above the top of the rail. There was a hasp

attached to about the middle of the door which, when the door was closed, fitted over a staple attached to the car, and the door was fastened by means of a pin or hook (which of the two does not appear from the evidence) dropped through the staple outside the hasp. There was a chain to the pin or hook, which was fastened to the car. There was a like contrivance for fastening the door back when opened back against the side of the car. . When the door stood open, at a right angle to the side of the car, the hasp extended out from the outside edge of the door three and one-half inches, so that the whole outward extension from the side of the car, including the hasp, was nineteen and one-fourth inches. The fruit cars extended outside the rails two feet, the refrigerator cars two feet two inches. Dickens testified that the latter cars are three or four inches wider than the former.

When the transfer train above described got on main track 5 it was backed south toward Seventy-second street, the engine being at its front or northern end pushing it, and the caboose being at its rear or southern end. When the caboose was within from three to four car lengths of the cross-walk above described, the train stopped for a signal, which not being given, the conductor, in about from one to two minutes, got off the train and walked south of the crossing to see if the switches were right. While he was thus engaged the train was backed toward the switches, across the cross-walk, blocking it, the caboose being about two car lengths south of the walk, when the train again stopped for about two minutes, after which, on a signal from the conductor, it proceeded south toward Fordham yards, rear end forward as before.

It was about 7.30 o'clock in the evening when the train arrived at Seventy-second street. The evening was dark and cloudy; the crew used lighted lanterns. It had been raining during the day, but whether it was raining at that time is not clear from the evidence.

The plaintiff was sixty-one years of age at the time; he had been in the service of appellant, as switchman, brake-

man and conductor, for thirty-two years, but quit the appellant's service in 1894, and had been engaged in carrying on a blacksmith's shop for about eight or ten months prior to the time of the accident. He was perfectly familiar with the right of way of appellant and with Seventy-second street in the vicinity of the cross-walk, and with the manner of running the trains. Appellee testified that in the evening in question he had been at a place between Seventy-third and Seventy-fourth streets on the east side of the railroad right of way and south of Seventy-second street; that intending to go to a place on Seventy-second street, west of the right of way, he walked north to Seventy-second street and west on the north sidewalk of that street to the walk across appellant's tracks; that as he approached the tracks, walking on the cross-walk, he saw a train moving slowly over the crossing on track number 3; that when he got up to track number 8 he saw the transfer train standing close to the crossing on track number 5; that he continued to walk west on the cross-walk till he came to track 6, stood on track 6 about a minute, then stepped in between tracks 6 and 5, intending to cross ahead of the train, but the train started up and he saw that he "couldn't make it." The space between tracks 5 and 6 is seven feet two inches in width, and appellee says that when the train was passing him he stood about the center of that space and the center of the sidewalk, and about a foot from the body of the cars; that he had looked both north and south for other trains, and at the time his body was fronting toward the car and his face in a southwesterly direction, and that as the train passed him, the ventilator door of one of the fruit cars struck and knocked him down; that he fell toward the south and his left hand went under the wheel, which passed over his arm between the wrist and elbow, and that he immediately got up and saw, from one to one and a half car lengths south of him, the fruit car door sticking straight out from the car. Appellee's injury was described by a surgeon who attended him that evening, as a crushing injury of the lower third of the arm. Appellee's arm was amputated the evening he was injured.

R. A. Winchester testified that between seven and eight o'clock in the evening in question he was standing at the corner of Seventy-sixth street and Woodlawn avenue, and saw a switching crew pushing a train south; that he was on the east side of the train, between tracks 5 and 6; that he recognized the engineer of the train, Al Heidenberg, and that he saw the ventilator door of a fruit car on the train sticking out from the car.

Heidenberg was the engineer of the transfer train that evening. He was dead at the time of the trial.

The contested questions of fact are whether the ventilator door of the fruit car was open; whether, if so, appellant was negligent in permitting it to be open; whether appellee was injured at the place and in the manner claimed by him, and, if so, whether he exercised ordinary care. Ryan, the conductor of the transfer train, testified that when the train left the Baltimore and Ohio junction to go north to Seventy-second street, the doors were all closed. He says that he observed this as he walked along the side of the train; also that it was the duty of Dickens, the hind switchman, to see that the train was all right before starting. This witness did not testify that the doors were fastened, and his evidence that they were all closed is not very satisfactory, for the reason that he seems to rely on what he says was his custom, viz., to walk alongside the train before starting. Dickens testified that he inspected the train after it was made up, and observed it when it left the Baltimore and Ohio junction, and that the ventilator doors of the fruit cars were then all closed; that he did not know whether they were fastened or not. Ralph Woodcock testified that he was car inspector at Fordham yards; that he inspected the train after its arrival there the evening in question, and that the car doors were all closed and fastened, but it appears from the record, though not from the abstract, that the witness was not at the station at Fordham yards when the train arrived there. He also testified that it was in the neighborhood of 7:15 o'clock p. m. when the train arrived, and that he didn't think it was dark, while Ryan

and Dickens both testified that it was 7:30 o'clock p. m. when the train passed Seventy-second street going south, and that it was dark, and Ryan, conductor, testified that it was eight o'clock p. m. when the train reached Fordham yards. Ellerty, station agent at South Chicago, says he saw the train there after it was made up, and had no knowledge of any ventilator doors being open.

We are of opinion that the jury was warranted by the evidence in finding that the ventilator door was open at the time of the alleged accident. Appellant's counsel contend that it was incumbent on appellee to prove, as a distinct, independent fact, that it was owing to negligence that the door was open; that negligence can not be inferred from the mere fact that the door was open. It is not necessary to prove negligence by direct, positive evidence. It may be proved, like any other fact, by circumstantial evidence. There is no evidence that the train stopped while proceeding north to the place where it backed onto main track 5, nor after it left the latter place until it reached Seventy-second street backing south. There was, therefore, little, if any, opportunity for any person not belonging to the crew to interfere with the door, and it seems improbable that if the door had been fastened in the manner heretofore described, the mere motion of the train would have unfastened it. Under these circumstances, we are of opinion that the jury could legitimately infer from the fact that the door was open, that it was left open by the negligence of appellant's servants.

Appellee testified that when he arose after the injury he walked north thirty feet or more, thinking he could get around the train more quickly than it would pass him, and go home, but when he saw the engine which was pushing the train about to pass him, he returned to the cross-walk and went west toward his home. No one saw him at the place of the injury, nor did any of the crew know of the accident until the next day. Dickens, who was on the rear end of the caboose (the front end as it was pushed south), testified that as the train approached the cross-walk and

was about three or four car lengths from the walk, he saw some one standing on or so close to track 5 that the train could not clear him; that he "hollered" to him, and he walked east out of the way; that it was too dark for him to recognize the person.

Egan, appellant's assistant superintendent, testified that he heard of appellee's injury about 11 o'clock, A. M., the next day after it occurred, and that shortly after 12 o'clock he went to Seventy-second street and investigated; that he found blood stains between tracks 5 and 6, and seventy-five feet north of the cross-walk he found pieces of bone and flesh underneath the ball of the east rail of south-bound track 5; that he traced the blood stains back to the cross-walk and along it to the west line of the right way, where the stains were lost, there being sand and no sidewalk there; that he had seen hundreds of places where accidents had happened, and that the indications of such an accident as the present always appear under the ball of the rail. The witness further testified that, after investigating as stated, he went to appellee's house, about 3 o'clock P. M.; that appellee's arm had then been amputated; that he was in bed and his mind seemed to be very rational, and that appellee told him that he was struck by the open door of a refrigerator car; that he said nothing about a fruit car. Lambert, yardmaster of appellant, was with Egan when the latter investigated, and also with him at appellee's house, and testified substantially as did Egan, except that his testimony is not quite so positive as to what was found under the rail. He testified that he saw blood and something that looked like flesh, in the hollow of the rail. On cross-examination he said he could see it was human flesh and blood, but could not tell whether there was bone or not. This witness also testified that appellee said he was struck by a refrigerator door. S. L. Losey, appellant's chief claim agent, testified that the next day after the accident he heard of it, and immediately went to appellee's house; that appellee seemed to be in full possession of his mental faculties, and talked frankly, freely and cheerfully,

and that appellee told him that he was struck by a refriger-ator car door. In rebuttal of this evidence, appellee called Eleanor E. Christy, a surgeon who assisted in amputating appellee's arm, and Mrs. Rogerson, appellee's daughter. Mrs. Christy testified that appellee's coat was not cut where his arm was crushed; that he had on an ordinary shirt and an undershirt; that there was very little evidence of profuse bleeding, as in the case of a sharp cut, and that after the operation a hypodermic injection of strychnine and mor-phine was administered to appellee, and that for two days thereafter he was kept under the influence of chloral and sulphur. Mrs. Rogerson testified substantially the same as Mrs. Christy as to the garments worn by appellee and the opiates administered to him, and in addition testified that she was present when Egan and Lambert interviewed appel-lee, and that he told them he was struck by the ventilator door of a fruit car.

Appellee, recalled, testified that he did not tell Egan, Lambert or Losey that he was struck by a refrigerator door.

We think the jury were justified by the evidence in reject-ing appellant's theory, based on the evidence of Egan and Lambert, that appellee was injured seventy-five feet north of the crossing, and in finding that he was injured at the place and in the manner claimed by him.

Track 6, on which appellee was standing just before he stepped into the space between tracks 5 and 6, is used exclusively for north-bound freight, and the tracks south of the cross-walk are straight for several miles. Under these circumstances, appellant's counsel urges that it should be held, as matter of law, that appellee was guilty of negli-gence or want of ordinary care which contributed to the injury; but in view of the decisions in this State, none of which within our knowledge has gone so far, and this court being intermediate between the trial and Supreme Courts, we do not feel warranted in holding otherwise than that the question whether appellee exercised ordinary care was one of fact to be decided by the jury. The declaration con-

tained three counts, in the first two of which it was averred that appellant's right of way crossed Seventy-second street, a public highway. Appellant's attorney, at the close of the evidence, moved the court to exclude appellee's evidence on the ground that the evidence was that appellant's tracks did not cross Seventy-second street, whereupon appellee, by leave of the court, filed an additional count, in which it is averred as follows:

·· " For that whereas, prior to and on, to wit, the 8th day of April, 1895, the defendant was possessed of and was operating a certain railroad extending, among other places, from the city of Chicago, county of Cook and State aforesaid, to southern points, eight tracks of which said railroad running parallel and adjacent thereto, then and there crossed Seventy-second street, in the city of Chicago, which was then and there a public highway upon each side of and abutting upon the defendant's right of way," etc.

When this count was filed, appellant's attorney again moved to exclude appellee's evidence on the same ground as formerly, which motion was overruled, and then appellant's attorney pleaded the statute of limitations, to which plea the court sustained a demurrer. These rulings of the court are assigned as error. The evidence failed to prove that appellant's right of way crosses Seventy-second street; on the contrary, appellee's own testimony was to the effect that it does not. While the additional count avers that appellant's tracks crossed Seventy-second street, it also, in describing the street, avers that it is "a public highway upon each side of and abutting upon the defendant's right of way." The street could not abut on appellant's right of way if it crossed it. Certainty to a certain intent in general is all that is required in a declaration, and taking the allegations of the count together, they may be understood as meaning that the tracks crossed what would be Seventy-second street, which abutted on the right of way, if produced across the right of way. But even though there is a variance between the declaration and the evidence, the question remains whether such variance is material. Appellant constructed a walk across its right of way

from the west end of the north sidewalk of Seventy-second street east of the right of way of about the same width as the sidewalk, and tacitly consented to the use by the public of the walk as if it were an extension of the north sidewalk of the street, and thus practically, if not in law, extended the north sidewalk of the street across the right of way. Under these circumstances, when appellant's train was approaching the cross-walk it was incumbent on it to exercise substantially the same care for the safety of the public as the law requires of it when its train is approaching a public crossing, except perhaps in the matter of ringing a bell or sounding a whistle. Kelly v. Railroad Co., 28 Minn. 98; Clampit v. Railroad Co., 84 Ia. 71; Taylor v. Railroad Co., 113 Pa. St. 162; R. R. Co. v. Hammer, 72 Ill. 347; Skjeggarud v. R. R. Co., 38 Minn. 56; Schindler v. R. R. Co., 87 Mich. 400; Webb v. R. R. Co., 57 Me. 117; Barry v. R. R. Co., 92 N. Y. 289.

Such being the law it is not material whether or not Seventy-second street is a legally established highway across appellant's right of way, and therefore the variance, if any, is immaterial. We are of opinion that appellant's motion was properly overruled and the demurrer to its plea properly sustained.

It is objected that the court erred in admitting certain evidence produced by appellee and in the giving and refusal of instructions. We find no error in these respects which we deem ground for reversal.

The judgment will be affirmed.